UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JAMIE RIDGE, | ) | Civil Action No.: 4:06-3507-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |
| BRUCE FARMER and | ) | |
| BURROUGHS & CHAPIN, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This is an employment discrimination case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. and for various state law tort claims.  The Plaintiff alleges causes of action against Burroughs & Chapin, Inc., her former employer, for: sexual harassment / discrimination in violation of Title VII, retaliation in violation of Title VII, negligence including negligent retention / supervision, and defamation. (Second  Am. Comp. (Document # 74).  The Plaintiff alleges causes of action against Bruce Farmer, her former supervisor, for: assault, battery, intentional infliction of emotional distress,[1] defamation, and interference with contract.[2]  Id. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 58).  The Plaintiff filed a Response in Opposition to Summary Judgment (Document # 68); the Defendants

---

[1] Plaintiff had alleged a claim against Burroughs & Chapin for intentional infliction of emotional distress.  Defendant noted that Plaintiff agreed to dismiss that claim, and Plaintiff agreed in her Opposition to Summary Judgment not to pursue it.  See Document # 68 at n.61.

[2] Plaintiff had alleged a claim against Farmer for negligence / gross negligence.  In response to the Defendants' Motion for Summary Judgment, the Plaintiff agreed to dismiss this claim.

filed a Reply (Document # 78); and the Plaintiff a Sur-Reply to the Reply (Document # 80).  All

pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28

U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC.  Because this is a dispositive

motion, this report and recommendation is entered for review by the district judge.

## II.    FACTUAL HISTORY

### A. Alleged Sexual Harassment by Farmer Prior to the Hotline Telephone Call

#### 1. 2003

Bruce Farmer interviewed the Plaintiff in February 2003.  (Pl. Dep. at 103 (Pl's Exh. 2)).

Burroughs & Chapin ("B&C") hired Plaintiff in March 2003 as a purchasing assistant, the same

position that Melissa Higgins had held.  In a separate civil action, Higgins alleges similar claims

against the same defendants.[3]  Plaintiff shared an office with Higgins.  (Pl. Dep. at 103 (Pl's Exh.

2)); (Higgins Dep. at 156-57, 266 (Pl's Exh. 3)).   The entry level position in purchasing was

purchasing assistant; the next level was purchasing associate, and purchasing agent was a

professional-level position above purchasing associate.  (Pl. Aff. at ¶ 2 (Pl's Exh. 1)).[4]   Plaintiff

reported to Defendant Bruce Farmer, Burroughs & Chapin's director of purchasing until mid-

February 2005. (Pl. Dep. at 215-16 (Pl's Exh. 2)).

Plaintiff and Higgins were acquaintances from church.  Plaintiff telephoned Higgins at her

home to discuss the purchasing assistant position and during the one hour conversation Higgins did

---

[3] Higgins v. Farmer and B&C, C/A No. 4:06-3501-RBH-TER.

[4] Defendants object to the Plaintiff's affidavit to the extent that it consists of conjecture, speculation, or inadmissible hearsay.  See Defendants' Reply at 4 n.5.  The court will rely on Plaintiff's affidavit to the extent that the facts are not conjecture, speculation, or inadmissible hearsay.

not tell Plaintiff how it was to work with Farmer.  (Higgins Dep. at 261-65 (Pl's Exh. 3)).  For the first couple months that Plaintiff worked in purchasing, Farmer did not bother her.  Then, Farmer began unwanted touching by leaning over her, rubbing her shoulders, and touching her hand.  (Pl. Dep. at 176-79 (Pl's Exh. 2)).  By the end of 2003, Farmer had touched Plaintiff more than a dozen times.  (Pl. Dep. at 179 (Pl's Exh.2)).

The record reveals several instances of unwelcome conduct that is not dated.  For example, Farmer frequently commented to Plaintiff that he found her to be "pretty" and on how her clothes looked on her.  (Pl. Aff. ¶ 4 (Pl's Exh. 1).  Farmer would tell Plaintiff how lucky her husband was to have her and how attractive she was.  Id. at ¶ 7.  On more than one occasion, Farmer told Plaintiff that he could see her bra and panties, and once he described to her the underwear that she was wearing.  Id. at ¶ 5.  Farmer would tell Plaintiff and Higgins that they were lucky to have their jobs, that they were lucky to make the money he paid them because they did not have college educations, that they would never have a boss as good as him, and that other employers would never hire them.  (Higgins Dep. at 406-07, 409, 410 (Pl's Exh. 3)); (Pl. Dep. at 207-09 (Pl's Exh. 2)).  Higgins observed on numerous occasions Plaintiff becoming upset and seemingly ill after an incident with Farmer.  (Higgins Aff. ¶ 35 (Pl's Exh.12)).

On or about June 11, 2003, Farmer called Higgins into his office and told her that she and Plaintiff looked stupid together, that due to her hair color, the way she looked and her age, senior staff was calling Higgins and Plaintiff dumb blonde bimbos.  (Higgins Dep. at 323 (Pl's Exh. 3)).  Plaintiff recalled that Farmer stated that senior management talked about her and Higgins in their morning meetings, how stupid they looked together, and called them dumb blonde bimbos.  (Pl. Dep. at 166 (Pl's Exh. 2)).  The next day, Plaintiff and Higgins reported Farmer's comments to Farmer's

-3-

supervisor, CFO Barry Spivey.  They complained to Spivey about Farmer's unwanted touchings, Farmer's propensity to get up close to them, and his "dumb blond bimbos" and "look stupid" comments.  (Higgins Dep. at 323-28 (Pl's Exh. 3)); (Pl. Dep. at 166 (Pl's Exh. 2)).  Spivey told Plaintiff and Higgins that B&C did not discriminate against women and that they had a vice-president who was a woman.  (Higgins Dep. at 327 (Pl's Exh. 3)).  Spivey told the Plaintiff and Higgins that he would speak to Farmer if they requested, which they did.  Id.  Farmer never called Plaintiff or Higgins a bimbo again nor said they looked stupid.  Id.  HR representative Amanda Broderick recalls Plaintiff and Higgins complaining about being called bimbos and Broderick passed this on to her immediate boss, Tara Little, as well as to the senior vice president for human resources, Mary Basden.  (Broderick Dep. at 28-30 (Pl's Exh. 4)). Basden told Broderick to speak to Plaintiff and Higgins about the manner in which they dressed. (Broderick Dep. at 29- 31 (Pl's Exh. 4)). The only evidence is that Plaintiff and Higgins dressed appropriately for the workplace.  (Broderick Dep. at 33 (Pl's Exh. 4)); (Farmer Dep. at 172 (Pl's Exh. 5)).

### 2. 2004

In 2004, Farmer began making comments to both Plaintiff and Higgins that they considered to be "vulgar."  For example, Farmer told a story related to his son getting beat up and the size of a boy's "dick" and Farmer demonstrated the size of his penis, exclaiming "it's this big, do you see me?, it's this big."  (Pl. Dep. at 190-91 (Pl's Exh. 2)); (Higgins Dep. at 329) (Pl's Exh. 3)); (Higgins Aff. ¶ 5 (Pl's Exh. 12)).  Farmer also picked up a model Ford wooden wagon that Higgins had on top of her computer and stated to Higgins and Plaintiff "I get a woody every day.  Did you hear me? I said, I get a woody every day, if you know what I mean."  (Pl. Dep. at 190 (Pl's Exh. 2)).

-4-

Jim Scales joined the purchasing department in 2004. (Scales Dep. at 23 (Pl's Exh. 6)). Farmer told Scales that Plaintiff and Higgins had reported his comments to Spivey and that they were trying to "stir the pot, stir things up" and "not be a team." (Scales Dep. at 21 (Pl's Exh. 6)). Scales testified: "There were numerous occasions when I first got there [Farmer] referred to them as the blonde bimbos. He would tell me that they weren't smart enough to do things on their own. They had to do things together. " (Scales Dep. at 19, 23 (Pl's Exh. 6)). Another purchasing agent, Regena Berg, also confirmed that she heard Farmer refer to Plaintiff and Higgins as blonde bimbos. (Berg Dep. at 115-16 (Pl's Exh. 8)). After the 2004 Super Bowl, at the staff meeting Farmer discussed for about five minutes Janet Jackson's breast, her nipple ring, how it took up her whole nipple, how it jiggled, how she had nice boobs. (Higgins Dep.at 330 (Pl's Exh. 3); (Pl. Dep. at 196-97, 199-200 (Pl's Exh.2 )); (Berg Dep. at 140 (Pl's Exh. 8)). In March of 2004, Farmer called Plaintiff on her cellular phone while she was out collecting checks for the March of Dimes. Farmer asked her to go to his house, clean it, cook him dinner, run him a bath, play music, turn the temperature down just right, and maybe he would let her go home. (Pl. Dep. at 191-93 (Pl's Exh. 2)); (Pl's Exh. 9). Farmer asked Higgins to do the same and stated that it would be ultimate job security. (Higgins Dep. at 332 (Pl's Exh. 3)) In April 2004, Plaintiff, Higgins, and Farmer attended a blood borne pathogen meeting during which Farmer asked Plaintiff and Higgins if their husbands used condoms during sex because it was dirty. (Higgins Dep. at 332-33 (Pl's Exh. 3); (Pl's Exh. 9); (Pl. Aff. ¶ 3 (Pl's Exh. 1)).

In 2004, Farmer told Plaintiff about rumored sexual escapades of other employees. (Pl. Dep. at 195 (Pl's Exh. 2)). In late 2004, Farmer told Plaintiff sexual stories, including a story of him making out with another employee, who was simulating having sex with Farmer in a bar after the 2004 Christmas party (Pl. Dep. at 196 (Pl's Exh. 2)), and about an incident in which a teenage

prostitute, who was in his car, offered him a "blow job." (Higgins Dep. at 334 (Pl's Exh. 3)); (Pl. Dep. at 194-95 (Pl's Exh. 2)); (Scales Dep. at 8-11 (Pl's Exh. 6)). Plaintiff stated that Farmer touched her on a daily basis in 2004 by rubbing her shoulders, leaning over her while she was sitting at her desk in a manner to rub across her breasts, and touched her hand when he handed her papers. (Pl. Dep. at 175 (Pl's Exh. 2)). For Christmas 2004, Farmer gave Plaintiff a gift card. He stated to Plaintiff that he wished he could have bought her a Victoria's Secret gift card and referred several times to her buying lingerie. (Pl. Aff. at ¶ 6 (Pl's Exh. 1)).

**B. Hotline Telephone Call on 2-7-2005 and the Resulting Investigation**

In February 2005, B&C implemented an anonymous 800 hotline for employees to call a third party to report employee issues and concerns. (Basden Dep. at 43-44 (Pl's Exh. 13)); (Wendel Dep. at 13-14 (Pl's Exh. 14)). In a meeting, Farmer stated to employees that the hotline was not for such matters as sexual harassment. (Higgins Aff. ¶ 8 (Pl's Exh. 12)). Berg testified that Farmer said the whistle blower thing was not for people who commit sexual harassment and that he was protected. (Berg Dep. at 93 (Pl's Exh. 8)). Soon after the hotline was began, Scales called the hotline to report Farmer's conduct towards Plaintiff and Higgins. (Scales Dep. at 87-88 (Pl's Exh. 6)); (Berg Dep. at 92-93 (Pl's Exh. 8)). Scales reported the conduct without telling Plaintiff and Higgins that he would do so; he advised them soon thereafter that he had reported Farmer's conduct so that they would be prepared to answer questions. (Scales Dep. at 87 (Pl's Exh. 6)).

Due to the hotline call, Mary Basden, vice president of human resources, conducted an investigation. (Little Dep. at 16-17 (Pl's Exh. 15)). Basden interviewed Plaintiff, Higgins, Berg, Scales, Diane Movsky (an employee from another department), and Farmer. (Basden Dep. at 124 (Pl's Exh. 13)); (Report of Investigation (Pl's Exh. 16)). Plaintiff and Higgins told Basden about

Farmer's unwelcome touchings, sexual comments, and his threats that he was untouchable.  (Report of Investigation (Pl's Exh. 16)).  Basden felt that Plaintiff and Higgins were being truthful.  (Basden Dep. at 86-87 (Pl's Exh. 13)).  Basden told Plaintiff that Farmer probably did not mean it or did not realize what he was doing, and that she would hate to see Farmer lose his job over something like this.  (Pl. Dep. at 204-05 (Pl's Exh. 2)).  Plaintiff and Higgins provided Basden with a list of examples of Farmer's conduct.  (Pl's Exh. 9); (Pl. Dep. at 227-28 (Pl's Exh. 2)); (Basden Dep. at 90 (Exh. 13)).

Farmer let his subordinates know that he was being investigated and that he had been reported for sexual harassment. (Berg Dep. at 90-91 (Pl's Exh. 8)).  Farmer told Scales that because of his connections the most he would get is a slap on his hands.  (Scales Dep. at 28 (Pl's Exh. 6)).  In fact, before the hotline call, Farmer had told Scales and Berg that he had protection and did not have to worry.  Id. at 12.  Berg corroborated Farmer's conduct during her interview with Basden. (Pl's Exh. 16). Basden questioned Scales as to whether he was the anonymous hotline caller, and he falsely denied it. (Scales Dep. at 6 (Pl's Exh. 6)).  During his interview with Basden, Scales corroborated Farmer's conduct and that Farmer told employees that he would not face any consequences for sexual harassment.  (Pl's Exh.16).  Basden also interviewed an employee, Diane Movsky, who was a friend of Farmer and did not recall working in close proximity to the purchasing department.  (Movsky Dep. at 17-18 (Pl's Exh. 17)).  Movsky told Basden that Farmer would make comments like "you look hot today"or "I dreamed about you last night." (Pl's Exh. 16). Movsky stated that Farmer was joking and it did not bother her but she understood how his comments could be taken the wrong way and construed as "creepy" by younger females.  Id.  Movsky does not recall

Basden asking her any questions about Plaintiff or Higgins.  (Movsky Dep. at 41-42 (Pl's Exh. 17)).

Basden interviewed Farmer.  Farmer stated that Basden did not tell him who on his staff was complaining about his conduct.  (Farmer Dep. At 138 (Pl's Exh. 5)).  Farmer admitted to telling some stories and jokes and to some touchings, but his version of what had transpired was different.  (Basden Dep. at 100-105 (Pl's Exh. 13)).  Basden testified: "This was just a situation where one person says one thing and one says it's not true." (Basden Dep. at 85-86 (Pl's Exh. 13)).  Basden concluded that Farmer's conduct was inappropriate but not severe or hostile.  She further concluded that Farmer had not intended for Plaintiff or Higgins to do anything of a sexual nature or that he was threatening them with their employment.   (Basden Dep. at 118-19 (Pl's Exh. 13)).   Basden considered: that she felt the incidents were isolated, that Plaintiff and Higgins enjoyed their jobs, and that neither of them had made the hotline call.  Id. at 119-20.  Basden concluded her investigation with her "summary/recommendations:"

> Based on consistent responses from four Purchasing Dept. Team members and one project accountant, I think that Bruce Farmer has made inappropriate comments that could have been interpreted to be of a sexual nature to staff members and that he has touched females in his department after they have asked him to stop.  Although this is a serious offense, I do not think that his intention was "quid pro quo" or that he intended to create a hostile work environment.  I recommend that the female purchasing associates be transferred under the supervision of Regena Berg, Senior Purchasing Agent.  Farmer should be advised to never take any female staff member behind closed doors alone and to never touch any staff member.  Farmer needs to apologize to the department (since all are aware of this accusation and have lost respect for him) and to admit to full responsibility for the perceived inappropriate behavior and to pledge to change going forward.  Also, Farmer should be required to repeat the sexual harassment/diversity training program again and Farmer should sign the attached acknowledgment form stating that he has attended and understands the policy. I suggest Farmer contact our EAP for counseling on this matter. Obviously, in the future, there can be no retaliation or threatening comments made by Farmer to anyone in the department.

(Pl's Exh. 16).  Farmer was not shown a copy of Basden's investigative report.  (Farmer Dep. at 168 (Pl's Exh. 5)).

Basden and Barry Spivey, Farmer's supervisor, met with Farmer to discuss the results of the investigation of his conduct.  (Farmer Dep. at 120-22 (Pl's Exh. 5)).  Farmer was told that the investigation had ended at inconclusive, that there was not enough evidence for them to know exactly what happened.  Id.  Farmer understood from Spivey that "because of the fact that this had happened that we needed to take some steps to show that we take this serious."  Id. at 121-22. Farmer and Spivey entered into a "Memorandum of Consensus/Corrective Action Counseling," dated February 15, 2005.  (Pl's Exh. 21).  The memorandum stated that he and Farmer had discussed two issues:

- Verbal use of phrases and comments to female subordinates interpreted as inappropriate and offensive.

- Touching female subordinates on the neck and back interpreted as inappropriate and offensive.

Id.  This memorandum memorialized Farmer's commitment to take certain steps, including: build trust with team, no one-on-one meetings with door closed, transfer supervision of purchasing associates to Berg, review and coaching in one-on-one meeting with Spivey, and review of training with human resources.  Id.  Further, Spivey wrote that he would follow up with Farmer on a regular basis to maintain Farmer's commitment.  Id.

Farmer testified: "I did not receive any discipline because there was nothing proved that I had done anything inappropriate. The investigation, to the best of my knowledge, found that was inconclusive and did not prove that I had done anything to either of these people or anyone else. And I was not disciplined." (Farmer Dep. at 126-27 (Pl's Exh. 5)).  The harassment allegations and

investigation were not mentioned to Farmer during any of Spivey's performance evaluations of Farmer. (Farmer Dep. at 181 (Pl's Exh. 5)). B&C did give verbal discipline to Farmer, coaching, counseling, recommendations, and additional training for sexual harassment. Id. at 127. Basden testified that by giving the corrective action counseling to Farmer, B&C had disciplined Farmer. (Basden Dep. at 134 (Def's Exh. R)).

After the investigation, Basden met with Plaintiff and Higgins to tell them the results. Basden told them Farmer admitted that he had done certain things, he was wrong, he did not realize what he was doing, and he thought of them as daughters. (Pl. Dep. at 215 (Pl's Exh. 2)). Basden told Plaintiff and Higgins to "move on, that we needed to just forget about it ." Id. Basden also stated: "Y'all don't need to talk to Bruce about things and put him in situations where he has to talk about things like that." Id. at 216. Basden told Plaintiff and Higgins that they would be supervised by Berg and that she would decide their raises and write their performance reviews. Id. Plaintiff testified that Basden did not offer her a transfer to any position in February 2005. (Pl. Aff. at ¶ 8 (Pl's Exh. 1)). After Basden's deposition, she stated that in February 2005 she offered Plaintiff and Higgins the opportunity to transfer to an equivalent position. (Basden Aff. at ¶ 2 (Def's Exh. W)).

In February or March of 2005, Farmer and Spivey met with the purchasing department in a staff meeting where Farmer stated that if he did something that the employees believed was wrong then he apologized. (Scales Dep. at 24 (Pl's Exh. 6)). Farmer recalled that he "took a level of responsibility for the perception that I had done something wrong." (Farmer Dep. at 138). Farmer told the group that he would no longer meet alone with Plaintiff or Higgins. (Higgins Dep. at 408 (Exh. 3)). Farmer also testified that he never admitted any wrongdoing during the staff meeting and he did not feel he had done anything wrong. (Farmer Dep. at 138 (Pl's Exh. 5)). Spivey told the

-10-

group that he admired Farmer's courage to come forth the way he did to apologize for what had happened. (Higgins Dep. at 350-51 (Pl's Exh.3 )); (Scales Dep. at 25 (Pl's Exh. 6)). Spivey did not say anything in support of those people in the department who had spoken out against Farmer's conduct. (Higgins Aff. ¶ 10 (Exh. 12)).

### C. Alleged Retaliation Against Plaintiff and Higgins and Continuing Harassment

#### 1. 2005

Soon after the hotline call and investigation, Farmer told Berg and Spivey that Plaintiff and Higgins had behavior issues, were not team players, and had bad attitudes. (Berg Dep. at 131 (Pl's Exh. 8)). Farmer told Berg that Plaintiff was controlling Higgins, but Berg testified that she did not agree with that assessment. (Berg Dep. at 132 (Pl's Exh. 8)). After the investigation, Farmer remarked to Higgins: "I will never be able to fire you now because of the sex harassment stuff." (Higgins Aff. ¶ 36 (Pl's Exh. 12). Also, when Plaintiff and Higgins would walk down the hall, Farmer would dramatically throw himself against the wall with his hands up and would hand work to Plaintiff and Higgins in a mocking, arms-length manner. (Higgins Dep. at 302 (Pl's Exh. 3)); (Scales Dep. at 46 (Pl's Exh. 6)); (Pl. Aff. ¶ 10 (Pl's Exh. 1)).

In January or February 2005, Farmer reached for Plaintiff's keyboard while she was sitting in her chair and Farmer's hand came very close to Plaintiff's crotch. (Pl. Dep. at 150-51 (Pl's Exh. 2)). Plaintiff backed away and said, "excuse me." Id. In 2005, on a daily basis Farmer looked down the back of Plaintiff's pants and down the front of her shirts, and he would lean over her touching his chest to her back. (Pl. Dep. at 149-52 (Pl's Exh. 2)). In the summer of 2005, Farmer brushed his hand across Plaintiff's cheek touching her for several seconds. Id. Also, after the investigation, Farmer saw a cat hair on Plaintiff's breast on the outside of her shirt; he reached for Plaintiff's breast

to try to pull off the cat hair, but Plaintiff backed away just before he touched her.  Id. at 152-54.  At the Christmas party in 2005, Farmer put his arm around Plaintiff's waist and stated that she looked very pretty that night.  (Pl. Dep. at 159-60 (Pl's Exh. 2)).  Berg testified: "after about a month, he slacked up, and he was, he started his old ways again, going in there behind ... their desks" and that she personally saw Farmer do this about four or five times in 2005.  (Berg Dep. at 102-03 (Pl's Exh. 13)).  Scales further corroborates seeing Farmer going back into Plaintiff and Higgins's cubicles after the investigation.  (Scales Dep. at 64 (Pl's Exh. 6)).  Gayle Taylor worked in the purchasing department from January 2005 to November 2006.  She stated that she "never witnessed any type of inappropriate conduct by Mr. Farmer towards Ms. Higgins and Ms. Ridge."  (Taylor Aff. at ¶ 3 (Def's Exh. P)).

In August 2005, Berg resigned to accept a new job with the City of North Myrtle Beach.  In her exit interview, she indicated that she had concerns about Farmer.  (Pl's Exh. 23).  Plaintiff and Higgins went to meet with Basden to ask whom they would be reporting to now that Berg was departing; they expressed concern to her that they did not want to report to Farmer.  (Pl. Dep. at 238-39 (Pl's Exh. 2)); (Higgins Dep. at 291-92 (Pl's Exh. 3)).  Basden told Plaintiff and Higgins, "Y'all haven't gotten past this, yet, you can't move on?" (Pl. Dep. at 238-39 (Pl's Exh. 2)).  Plaintiff and Higgins answered "no, ma'am."  Basden responded that "maybe if y'all can't get past this, y'all should transfer, maybe look for another job."  Id.; (Higgins Dep. at 405 (Pl's Exh. 3)).  Higgins testified that Basden did not actually offer her a transfer in any particular department.  (Higgins Dep. at 405 (Pl's Exh. 3)).  Basden stated that at the August 2005 meeting she asked Plaintiff and Higgins if they were interested in transferring to another department within B&C.  (Basden Aff. at ¶ 2 (Def's Exh. R)).  Higgins responded why should I leave when I have not done anything wrong.  (Higgins

-12-

Dep. at 405 (Pl's Exh. 3)).  Basden told Plaintiff and Higgins that she would speak to Spivey to find out whom they would begin to report to and would let them know, but Basden did not get back with them.  (Pl. Dep. at 239-40 (Pl's Exh. 2)).  After the August 2005 meeting with Basden, Plaintiff and Higgins wrote a letter to Basden to advise her of their concerns about Farmer's conduct and sent it via interoffice mail (Pl's Exh. 24).  Higgins testified that after the letter was mailed, Basden attempted to call Higgins about three times and left her voice mail messages indicating that Basden wanted to speak with Higgins alone.  (Higgins Dep at 345-50 (Pl's Exh. 3)).  There is nothing in the record as to whether Basden tried to call Plaintiff.  Higgins left a voice mail message for Basden explaining that "they [management] had done nothing to help us, Bruce was still doing the things he was doing, ... that he was being protected, and that we had come to the conclusion that if we were going to continue to work for Burroughs & Chapin, we were going to have to deal with Bruce Farmer."  (Higgins Dep. at 345-49 (Pl's Exh. 3)).

### 2. 2006

In January 2006, Danny Millwood entered the department as purchasing manager and became Plaintiff's direct supervisor.  (Millwood Dep. at 13, 16, 21 (Pl's Exh. 22)).  Millwood reported to Farmer.  Scales testified that Millwood became "degrading," "belligerent" towards and "extremely rude" to Plaintiff, Higgins, and himself.  (Scales Dep. at 46-47, 71-73 (Pl's Exh. 6)).  Scales stated that Millwood treated others in the department differently.  Id. at 47.  Millwood told Plaintiff and Higgins that he was aware that things had happened in the department in the past. (Higgins Aff. ¶ 18 (Exh. 12)); (Pl. Aff. ¶ 12 (Exh. 1)).  Millwood told Plaintiff and Higgins to come into his office and inform him of the substance of every communication they had with anyone.  (Pl. Dep. at 43 (Pl's

Exh. 2)) ("He expected Melissa Higgins, Beth Stocksdale, and I to come to him every time we spoke to a vendor, for every email we ever received. He wanted to know everything that we did.").

Plaintiff was on maternity leave from March 20, 2006, until around the first of May 2006. (Pl. Dep. at 20, 30 (Pl's Exh. 2)). At Millwood's request, Plaintiff had helped to train Millwood before she left for maternity leave. Id. at 43. When Plaintiff was preparing to leave for eight weeks maternity leave, Millwood came to her office and stated that Plaintiff needed to pack all of her personal belongings because she may not be returning. Id. at 22-25. Plaintiff responded that she did plan on returning, and she did not pack her things. Id. Millwood made the comment to Plaintiff several times in the weeks leading up to maternity leave that she needed to pack her personal things in case she did not come back. Id.

Taylor stated that in late February 2006 she received an invitation to a baby shower for Ridge and that Taylor attended; there were approximately fifty (50) people there including Farmer and Millwood. (Taylor Aff. at ¶ 2-4 (Def's Exh. P)). Taylor witnessed that Higgins and Plaintiff appeared to have friendly interactions with Farmer and Millwood. Id. Higgins recalled that the entire department was invited to the baby shower because they had participated in planning it or paying for it and she does not recall speaking to Farmer or Millwood there. (Higgins Aff. at ¶ 31 (Pl's Exh. 12)). Plaintiff stated that baby showers were common at B&C and she does not recall speaking with Farmer or Millwood there. (Pl. Aff. at ¶ 22 (Pl's Exh. 1)). Taylor stated that in March or April 2006 there was a goodbye luncheon for Beth Stocksdale at a restaurant and attendance was voluntary. (Taylor Aff. at ¶ 6-8 (Def's Exh. P)). Seven people who worked in the purchasing department attended, including Higgins and Plaintiff, who was on maternity leave. Id. Taylor recalled that Plaintiff sat next to Farmer. Id. The luncheon lasted about ninety minutes and everyone

-14-

appeared to have a good time.  Id.  Plaintiff recalled that she did not sit next to Farmer or Millwood at the luncheon.  (Pl. Aff. at ¶ 23 (Pl's Exh. 1)).

### D. Plaintiff's Salary, Bonuses, and Evaluations

Farmer wrote and conducted three performance reviews for Plaintiff prior to the investigation.  Plaintiff testified that the overall scores were accurate and correct and that she concurred.  (Pl. Dep. at 134-36 (Def's Exh. B)).  It appears that when Plaintiff began her employment she earned $10.09 per hour.  (Pl's Exh. 40).  Farmer conducted Plaintiff's 2003 year-end review and gave her an overall score of 4.0 which indicated "exceeds expectations."  (Def's Exh. C).  The evaluation form indicated in small print under "behavioral goals" section: "Use of behavioral goals is not required.  Please use when needed to highlight or address growth areas for employees."  Id.  No behavioral goal was indicated for Plaintiff.  Id.  During the evaluation, Plaintiff was told by Farmer that behavioral analyses were only performed for problem employees.  (Pl. Dep. at 140 (Pl's Exh. 2)).  In February 2004, it appears that Farmer requested a raise for Plaintiff from $20,987.20 to $22,246.43.  (Pl's Exh. 35).

For Plaintiff's June 2004 evaluation, Farmer gave her a 3.7 overall score which indicated "exceeds expectations."  (Def's Exh. D).  The evaluation form indicated in small print under "behavioral goals" section: "Use of behavioral goals is not required.  Please use when needed to highlight or address growth areas for ... ."  Id.  No behavioral goal was indicated for Plaintiff.  Id.  Farmer conducted Plaintiff's year-end 2004 evaluation, and he gave her an overall score of 3.85 which indicated "exceeds expectations."  (Def's Exh. E).  The evaluation form indicated for the "behavioral goals" section: "see behaviors evaluation sheet – attached or next."  Id.  No behavioral goal was indicated for Plaintiff.  Id.  In July 2004, Plaintiff received a raise to $11.13 per hour.  (Pl's

-15-

Exh. 39).  It appears that Plaintiff received a 2004 year-end bonus of $1,750.00.  (Pl's Exh. 45, handwritten notation).

On January 3, 2005, Plaintiff was promoted to purchasing associate, and Farmer sent an email to the purchasing department employees to announce the promotion.  (Def's Exh. F).  On the same date, Plaintiff received a salary of $495.54 per week, or $25,768 per year.  (Pl's Exh. 41, 42).

For Plaintiff's semiannual 2005 evaluation, Berg and Farmer signed the review.  (Def's Exh. G).  Berg gave Plaintiff an overall score of 3.1 with the behavioral section rated as a 3.0.  Id.  The behavioral section contained several positive comments including: "demonstrates integrity and honesty through words and actions and works well with supervisors and co-workers."  Id.  However, the behavioral section stated: "needs to focus more on the positive, needs to become more team oriented, needs to be more independent."  Id.  Plaintiff testified that she thought Berg's evaluation was fair and that Berg had completed the behavioral section in order to "show Barry that we did not have any behavioral problems."  (Pl. Dep. at 138, 141-42 (Def's Exh. B)).  Higgins testified that even with Berg writing her and Plaintiff's evaluations that Farmer still had the ultimate say-so.  (Higgins Dep. at 290-91 (Pl's Exh. 3)).  Farmer told Plaintiff and Higgins that even if supervisors were writing evaluations he would be deciding the amount of the raises.  (Higgins Aff. ¶ 15 (Pl's Exh. 12); (Pl. Aff. ¶ 11 (Pl's Exh. 1)).

Berg testified that she completed the behavioral section, which was optional, to show that in her opinion there was not an issue.  (Berg Dep. at 130-31 (Pl's Exh. 8)); (Basden Aff. at ¶ 3 (Def's Exh. R)).  During the meeting where Spivey asked Berg to be Plaintiff's supervisor, Berg heard Farmer say to Spivey that Plaintiff and Higgins were not team players and had bad attitudes.  (Berg Dep. at 130-32 (Pl's Exh. 8)).  Basden testified that whether a behavioral analysis is done is in the

-16-

discretion of management, and she further explained in her affidavit that "[t]he behavioral component is not intended for disciplinary purposes nor is it utilized for problem employees." (Basden Dep. at 129 (Pl's Exh. 13)).

On Plaintiff's December 2005 evaluation, Farmer gave Plaintiff an overall score of 3.2 which indicated "meets expectations." (Def's Exh. H). The behavioral goal section scored Plaintiff at 3.0, but no behavioral sheet was attached. Id. By December 14, 2005, Plaintiff's yearly salary was $27,583.40, and she received a year-end bonus of $2,708.65. (Pl's Exh. 45). It appears that Plaintiff's final salary was $27,583.40. (Pl's Exh. 46).

In 2006, Millwood and Farmer went to HR and spoke with Tara Little two or three times before evaluations to discuss Plaintiff 's complaining. (Little Dep. at 53-56 (Pl's Exh. 15)). "The opinion was that Melissa was a good employee. She didn't complain a lot or any prior to Jamie starting work. And then after Jamie started, they tended to complain together." (Little Dep. at 54 (Pl's Exh. 15). Little understood that Millwood was doing a behavioral analysis on Plaintiff because of the alleged influence she had on Higgins. (Little Dep. at 53-54 (Pl's Exh. 15)). Millwood testified that neither Higgins nor Plaintiff ever complained to him. (Millwood Dep. at 70-71 (Pl's Exh. 22)).

Millwood wrote and conducted Plaintiff's May 2006 evaluation, a copy of which is not in the record. (Pl. Dep. at 41 (Def's Exh. B)). Plaintiff disagreed with the evaluation and would not sign it. Id. The review stated that Plaintiff needed to better understand teamwork and she needed to develop a good working relationship with her supervisors. (Pl. Dep. at 48 (Pl's Exh. 2)). It appears that Millwood later changed Plaintiff's evaluation in her favor, but Plaintiff did not know it and never had seen a copy of that until her deposition. Id. at 69. Plaintiff testified that during her review meeting, which occurred on her first day back from maternity leave, Millwood stated that he

could be her "best friend or worst enemy" and that he and Farmer had gone to Little in HR to tell them everything they thought about her.  (Pl. Dep. at 30-31, 81-82 (Pl's Exh. 2)).

Millwood testified that he had only worked with Plaintiff for about three months before she left for maternity leave which was his first three months in the purchasing department and that it was very hard for him to have any kind of full opinion about Plaintiff.  (Millwood Dep. at 25-26 (Pl's Exh. 22)).  Millwood testified that he decided to write a behavioral analysis on Plaintiff and, to be fair, on all of the employees.  (Millwood Dep. at 40 (Pl's Exh. 22)); (Millwood Dep. at 41 (Def's Exh. I)).  By May of 2006, Plaintiff and Higgins reported to Millwood; Stocksdale had departed in March of 2006.  (Millwood Dep. at 16, 21 (Pl's Exh. 22)).  Also, Gayle Taylor worked in purchasing in May 2006.  (Taylor Dep. at 25, 31 ((Pl's Exh. 7)).  The overall score given to Plaintiff and Higgins by Millwood in May 2006 was in the top 5% of scores he had given during his twelve years with B&C during reviews of 700 or 800 people.  (Millwood Dep. at 97-98 (Def's Exh. I)).

### E. Plaintiff's Resignation and B&C's Alleged Defamation

Plaintiff testified that on her first day back from maternity leave she thought about leaving B&C.  (Pl. Dep. at 81-82 (Pl's Exh. 2).  She thought of leaving because Millwood had rudely suggested that she not come back from maternity leave, then on the day she returned to work Millwood told her he could be her best friend or worst enemy, was not nice, and Millwood further told Plaintiff that he and Farmer had told Little what they thought of her.  Id.; see also (Pl. Aff. at ¶ 26 (Pl's Exh. 1) (stating that she also resigned because of Farmer's treatment of her and B&C's refusal to remedy the situation).  On the evening of May 11, Plaintiff and Higgins, with their husbands present, decided to resign.  (Higgins Dep. at 366 (Pl's Exh. 3)).  Plaintiff and Higgins decided to start their own cleaning business.  (Pl. Dep. at 253 (Def's Exh. B)).  On Friday, May 12,

2006, Plaintiff and Higgins gave their resignation letters to Millwood and two-weeks notice. (Pl. Dep. at 102 (Def's Exh. B)).  Plaintiff stated that she gave everyone in their department a copy of the letter.[5]  Id. at 98.  Millwood did not understand the explanation in the resignations (Millwood Dep. at 53 (Pl's Exh. 22)).  Millwood testified that he did not ask Plaintiff or Higgins their reasons for resigning because, after speaking to Little and Farmer, he understood that they likely resigned because of their issues with Farmer.  (Millwood Dep. at 47-51 (Pl's Exh. 22)).

Millwood took the letters to Little in HR and they discussed accepting their resignations and moving on. (Millwood Dep. at 54 (Pl's Exh. 22)).  Little stated that on Monday morning (May 15, 2006) Millwood asked Little if we could ask Plaintiff and Higgins to leave immediately.  (Little Dep. at 63 (Pl's Exh. 15)).  Millwood stated that "the recommendation was made that they not be required to work their two weeks notice period and I agreed with that recommendation."  (Millwood Aff. at ¶ 3 (Def's Exh. X)).  Millwood characterized Plaintiff and Higgins as "disgruntled." (Millwood Dep. at 67-68 (Pl's Exh. 22)).  Millwood stated that his basis for claiming that Plaintiff and Higgins were disgruntled was based on information provided by Farmer.  (Millwood Dep. at 67-69 (Pl's Exh. 22)).  Millwood further stated: "[O]bviously they had issues with Bruce Farmer.  And so obviously, in my mind, to me, that's being a little disgruntled."  Id.  Millwood stated that on the Monday after Plaintiff and Higgins had submitted resignations he observed that the employees in purchasing were not working as they should.  (Millwood Aff. at ¶ 3 (Def's Exh. X)).  Little testified that "she took Danny [Millwood]'s word for it" that Plaintiff and Higgins were disrupting the department on Monday. (Little Dep. at 74-75 (Pl's Exh. 15)).  Little stated that she believed that they had passed out resignation letters, were telling other employees they were leaving, and were not working.  Id.

_____

[5] The resignation letter is not in the record.

-19-

Farmer testified that Plaintiff and Higgins were not being disruptive on Monday morning.  (Farmer Dep. at 187-88 (Pl's Exh. 5)).  Millwood called Plaintiff and Higgins into his office where Little gave them paychecks and boxes, and Little told Plaintiff and Higgins that they must leave immediately.  (Higgins Dep. at 383-84 (Pl's Exh. 3)); (Pl. Dep. at 100-01 (Pl's Exh. 2)).

Human resources' employees testified that other B&C employees have been asked to leave immediately when he or she violated company policies and procedures or had access to highly confidential information and that it was in management's discretion.  (Little Dep. at 79, 90 (Pl's Exh. 15)); (Broderick Dep. at 34-35 (Pl's Exh. 4)).  Higgins stated that in the purchasing department both Stocksdale and Berg worked a notice period.  (Higgins Aff. at ¶ 33 (Pl's Exh. 12)).  Beth Stocksdale received a goodbye luncheon in March or April 2006.  (Taylor Aff. at ¶ 6 (Def's Exh. P)).

B&C's president, Doug Wendel, heard that rumors were going around that Plaintiff and Higgins had resigned because they were being harassed by Farmer.  (Wendel Dep. at 28 (Pl's Exh. 14)).  Spivey told Wendel that Plaintiff and Higgins were asked to leave B&C immediately because of those rumors.  Id. at 31, 46-47.  Wendel held a meeting of all employees who work on the fourth floor to explain why Plaintiff and Higgins were asked to leave early.  Id. at 45.  The departments on the fourth floor were purchasing, corporate administration, risk management, procurement, budget, design and construction, project accounting, graphics information services, public relations, the executive staff, and general counsel.  (Spivey Dep. at 94-95 (Pl's Exh. 18)).  Wendel outlined the procedures B&C had for employee concerns and issues and told everyone that Plaintiff and Higgins were asked to leave early with pay because "they were not conducting their business affairs in an appropriate manner, period."  (Wendel Dep. at 45-46 (Pl's Exh. 14)).  Wendel stated that the two employees who were asked to leave were "disgruntled," there were some serious allegations, to

-20-

disregard the allegations, B&C was supporting Bruce 100 percent, and an investigation was ongoing and that it would be resolved. (Scales Dep. at 56 (Pl's Exh. 6)).

Wendel testified that his knowledge of Plaintiff and Higgins' conduct after their resignation came from Spivey. (Wendel Dep. at 46-47 (Pl's Exh. 14)). Spivey had no personal knowledge of Plaintiff and Higgins' conduct after their resignation; he received his information from Basden. (Spivey Dep. at 83-84 (Pl's Exh. 18)). Basden testified: "I don't know that they were disruptive." (Basden Dep. at 34 (Pl's Exh. 13)). Basden stated that Little and Millwood told her that a lot of discussion was going on in other departments and work was not being done. Id. at 34. Basden stated that Millwood did not need the Plaintiff and Higgins for the two weeks. Id. at 33.

### F. Plaintiff and Higgins' Cleaning Business

At the time Plaintiff resigned, she and Higgins decided to open their own cleaning business. At the deposition, Plaintiff testified that she cleaned sometimes one day per week and sometimes three days per week. (Pl. Dep. at 253 (Def's Exh. B)). At some point after the deposition, Plaintiff and Higgins lowered some prices in the hope to get more work. (Higgins Aff. at ¶ 27 (Pl's Exh. 12)); (Pl. Aff. at ¶ 27 (Pl's Exh. 1)). They have spent many hours promoting the business, and they have picked up more clients. (Pl. Aff. at ¶ 27-28 (Pl's Exh. 1)); (Higgins Aff. at ¶ 27 (Pl's Exh. 1). Plaintiff and Higgins do not desire to work part-time; if the business does not grow into a full time opportunity, they will seek other employment. Id.

### G. Plaintiff's Complaints Post-Employment

Plaintiff filed an Affidavit and Charge of Discrimination on May 18, 2006, wherein she declared that she was first subjected to discrimination in approximately April 2003 and the latest date of discrimination was May 15, 2006. (Def's Exh. W). Plaintiff checked the boxes for discrimination

based on "sex" and "retaliation." Plaintiff did not check the box for "continuing violation." Her

charge stated:

> I was employed by Respondent as a purchasing agent. Throughout
> my employment I was subjected to harassment on the basis of my sex.
> Respondent failed to take any action to prevent the harassment or to
> rectify the same. After I reported the harassment, Respondent
> discriminated against me further and retaliated against me by, among
> other things, harassing and intimidating me, disciplining me, and
> failing to give me a raise commensurate with my performance. This
> harassment retaliation culminated in the constructive termination of
> my employment on May 15, 2006.

Id. Plaintiff filed her lawsuit on May 31, 2006, in the Horry County Court of Common Pleas. After

the Plaintiff filed an amended complaint, Defendants removed this action to the United States

District Court on December 13, 2006.

## III.     STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary

judgment is proper if there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law. Rule 56(c), FRCP; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Summary judgment is proper if the non-moving party fails to establish an essential element of any

cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine issue for trial on a

material element of the non-moving party's claims, the non-moving party bears the burden of coming

forward with specific facts which show a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita

Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party

must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could

reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

Rule 56(e) provides, "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." See also Celetex Corp. v. Catrett, 477 U.S. 317, 324 (1986)(Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves"). To raise a genuine issue of material fact, a party may not rest upon the mere allegations or denials of his pleadings. Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A. Claims against B&C based upon Title VII sex discrimination and harassment

#### 1. Continuing Violation Doctrine

Defendant moves for summary judgment on the ground that Plaintiff cannot rely on the "continuing violation" doctrine to hold B&C liable for Farmer's alleged sexual harassment that occurred as far back as 2003. B&C argues that Plaintiff cannot recover for acts which occurred prior to February 2005 because B&C took intervening action that broke the causal link, and the conduct that occurred prior to the intervening action cannot be part of this hostile work environment claim. Therefore, B&C argues if the alleged harassment between 2003 and February 2005 cannot be part of this hostile work environment claim, the statute of limitations has run because those acts occurred more than 300 days prior to May 18, 2006, the date the Plaintiff filed her complaint with the EEOC and SHAC.

To pursue a claim under Title VII, a plaintiff must file a complaint with the EEOC within either 180 days or 300 days "after the alleged unlawful employment practice occurred." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) (citing 42 U.S.C. § 2000e). The Morgan Court held that "the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period" but that behavior alleged outside of the statutory time period may be considered "for the purposes of assessing liability, so long as an act contributing to the hostile environment takes place within the statutory time period." Id. at 105. Hostile environment claims occur over a series of days or perhaps years; a hostile environment claim is based upon the cumulative effect of individual acts. Id. at 115. "In order for a claim to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. at 118.

"The Supreme Court made clear…that the reach of the continuing violations doctrine in the context of a hostile work environment claim is not limitless. The otherwise time-barred conduct

-24-

must be related to non-time-barred conduct and the employer may be able to take intervening curative action that cuts off the temporal reach of the hostile work environment claim." Wallace v. Chicago Hous. Auth., 298 F. Supp. 2d 710, 716 (N.D. Ill. 2003). See Hughes v. Conway Hosp., Inc., C/A No. 4:04-875-TLW-TER (D.S.C. 2006) (finding no continuing violation where the employer's actions of investigating plaintiff's sexual harassment claims, assigning the perpetrator to a different shift, and instructing perpetrator and plaintiff not to be alone in a room, were effective to end the harassing behavior for fifteen months); Randall v. Potter, 366 F. Supp. 2d 104, 118 (D.Me. 2005) (finding effective intervening action where employer transferred an employee, disciplined another, and plaintiff was placed on a different crew); Vickers v. Powell, 493 F.3d 186, 199-200 (D.C. Cir. 2007) (noting that sometimes a change in manager may constitute an intervening action, but in this case the management change was not intended to address the work environment and the harassment intensified); Rowe v. Hussmann Corp., 381 F.3d 775, 780-81 (8th Cir. 2004) (finding no sufficient intervening action by employer where supervisor warned perpetrator to stop the conduct and it did stop for seven months, distinguishing a case where the harrasser and victim had no contact for 21 months).

Defendants argue that the following intervening actions taken by B&C in February 2005 changed Plaintiff's work environment such that it was no longer hostile: B&C promptly investigated the hotline telephone call regarding Farmer's conduct; B&C disciplined Farmer; B&C placed Plaintiff and Higgins under a new supervisor, Berg; Basden offered Plaintiff the opportunity to transfer to a different department; B&C required Farmer to apologize to his department; B&C sent Farmer to sexual harassment training; and B&C instructed Farmer to have only open door meetings with Plaintiff and Higgins. Plaintiff argues that Farmer was not actually disciplined because Farmer

testified that he was not disciplined because it was not proved that he had done anything inappropriate.  The court finds that, even in the light most favorable to Plaintiff, B&C did discipline Farmer even if B&C did not use the word "discipline."  Farmer testified that he did receive verbal discipline, and coaching and counseling.  (Farmer Dep. at 127 (Pl's Exh. 5)).  Farmer was instructed to have no further closed door meetings with Plaintiff, and there is no evidence in the record of any closed door meetings between Plaintiff and Farmer or hugs after B&C's instruction.  Farmer also attended sexual harassment training at B&C's request.  B&C through Basden promptly investigated the hotline telephone call and promptly gave Farmer a memo of "consensus corrective action counseling" on February 24, 2005.  Spivey, Farmer's supervisor, sometime during the investigation explained to Farmer the seriousness of the situation, but Farmer stated that during his performance reviews the sexual harassment allegations against him did not come up.  The court cannot give any consideration to Defendant's assertion that the Plaintiff could have transferred to another department.  In the light most favorable to the Plaintiff, the court finds that Basden did not offer Plaintiff a transfer to another department in February 2005.

Even though B&C took certain proactive steps in an attempt to alter the Plaintiff's hostile work environment, the result was not successful or effective in deterring Farmer.  In the light most favorable to the Plaintiff, on a daily basis in 2005 Farmer looked down the back of Plaintiff's pants and down the front of her shirts, and he would lean over her touching his chest to her back.  In the summer of 2005, Farmer brushed his hand across Plaintiff's cheek touching her for several seconds.  Also, Farmer saw a cat hair on Plaintiff's breast on the outside of her shirt; he reached for Plaintiff's breast to try to pull off the cat hair, but Plaintiff backed away just before he touched her.  At the Christmas party in 2005, Farmer put his arm around Plaintiff's waist and stated that she looked very

pretty that night. Berg and Scales corroborated that this unwelcome conduct occurred after the February 2005 investigation. Several people testified that in Farmer's apology to the department he did not really admit any wrongdoing. Also, in August of 2005, Plaintiff and Higgins informed Basden verbally in a meeting, and in a letter dated August 5, 2005, that Farmer's sexually harassing conduct was continuing and that Farmer was "bad mouthing" their work and they feared he was retaliating. In that meeting, Basden stated to Plaintiff and Higgins, "you haven't gotten over this yet? ... if you can't get past this, y'all should transfer, maybe look for another job." Although Plaintiff was told to report to Berg, a reasonable juror could conclude that Berg was the supervisor in name only. Farmer let Berg and Plaintiff know that he had the ultimate say so about Plaintiff's raises. After August 2005 when Berg resigned until January 2006 when Millwood joined the department, it appears that Farmer was Plaintiff's direct supervisor again and wrote her December 2005 evaluation even though Plaintiff and Higgins had specifically discussed with Basden that they not be required to report to him. In the light most favorable to the Plaintiff, she and Higgins informed B&C that Farmer's conduct had not really stopped and B&C did not take further action to remedy the situation. Accordingly, as a matter of law, B&C's actions cannot be deemed effective remedial intervening action. Plaintiff's claim for a hostile work environment should be permitted to include Farmer's conduct beginning in 2003 until May 15, 2006, because at least one discreet act -- Farmer's putting his arm around Plaintiff's waist at the company party -- occurred in December 2005 within the 300-day window.

Defendants further argue that Plaintiff cannot use the continuing violation doctrine because on several occasions Plaintiff failed to report Farmer's conduct to management when she knew that his conduct may have been considered sexual harassment. However, the <u>Morgan</u> Court explained

-27-

that discrete acts of discriminatory behavior that occurs outside the statutory time period may be considered "for the purposes of assessing liability, so long as an act contributing to the hostile environment takes place within the statutory time period." Morgan, 536 U.S. at 105. Here, the unwelcome conduct that began in 2003 and continued until 2006 was similar and it was committed by the same person. Therefore, all of the unwelcome conduct was related and is part of the same actionable hostile work environment practice. The Morgan court noted that even if the plaintiff knew on a certain day that actionable conduct happened that is not relevant to the inquiry of whether the charge was filed within 180 or 300 days of any act that is part of the hostile work environment. Id. at 118. Accordingly, whether Plaintiff knew that Farmer's conduct constituted sexual harassment back in 2003 does not affect the continuing violation / intervening action analysis.

### 2. Hostile Work Environment – Severe or Pervasive

To establish a hostile work environment claim, Plaintiff must present evidence to prove the following elements: 1) she was subjected to unwelcome conduct in a work related setting; 2) the conduct complained of was based on her sex; 3) the conduct was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and 4) the conduct is imputable on some factual basis to her employer. Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir.2003) (en banc); Spicer v. Com.of Va. Dep't of Corrections, 66 F.3d 705, 710 (4th Cir.1995) (en banc); Brown v. Perry, 184 F.3d 388, 393 (4th Cir.1999).

Defendants move for summary judgment on the ground that as a matter of law the alleged harassment was not severe or pervasive. Defendants focus solely on conduct after the February 2005 investigation because, as set forth above, it argues that Farmer's prior conduct may not be considered by the court. Defendants argue that Plaintiff's testimony establishes that Farmer looked down

Plaintiff's pants on occasion, rubbed her shoulders on occasion, and hugged her twice in 2005 and that these were isolated incidents that did not create an abusive atmosphere. Defendants point to Plaintiff's testimony that Farmer did not touch her in 2006 except on the hand the last day of her employment. Defendants further argue that Millwood's no-nonsense or rude management style was not severe or pervasive, that there is no evidence that Millwood acted that way because Plaintiff is a female, and that Farmer and Millwood's conduct did not interfere with her ability to perform her job.

To qualify as severe and pervasive for purposes of Title VII, the harassment must be objectively and subjectively severe or pervasive as to alter the conditions of plaintiff's employment and render the workplace abusive. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998); E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008); Hartsell v. Duplex Products, 123 F.3d 766, 773 (4th Cir. 1997). To be objectively offensive, the conduct must create "an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). The Fourth Circuit has utilized an approach evaluating all of the circumstances in determining whether conduct was objectively abusive, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333 (4th Cir. 2003). The objective inquiry cannot be a mathematically precise test and no single factor is dispositive. E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). This legal standard is designed to filter out complaints attacking "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Ocheltree, 335 F.3d at 333

-29-

(quoting <u>Faragher</u>, 524 U.S. at 788).  A workplace is sufficiently severe or pervasive when it "is permeated with discriminatory intimidation, ridicule, and insult." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 20 (1993)(internal quotation omitted).  Title VII forbids "only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 523 U.S. 75, 81 (1998).  The conduct must be sufficiently severe and pervasive to "ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation – for discriminatory conditions of confinement." <u>Id</u>.  As the Fourth Circuit Court of Appeals recently explained, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test. ... The task on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." <u>E.E.O.C. v. Sunbelt Rentals, Inc.</u>, 521 F.3d at 315-16.

For reasons set forth above, the court believes that Farmer's conduct from 2003 to May 2006 can be considered with regard to Plaintiff's hostile work environment claim.  Plaintiff claims that Farmer's conduct was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment.  Throughout Plaintiff's time in the purchasing department, Farmer frequently leaned over Plaintiff, touched Plaintiff, and made sexually suggestive comments to her.  On occasion, Farmer hugged Plaintiff.  Farmer often discussed various women's bodies explaining what parts he liked, tried to look down Plaintiff's clothes, told offensive stories with sexual content ("blow job," prostitute, and how he got a "woody" every day), and tried to demonstrate with his hands the size of his penis.  Farmer's conduct was frequent rather than isolated.  He used language that demeaned her based on her sex ("dumb blonde bimbos") and engaged in other conduct that was humiliating.  Farmer told Plaintiff and Higgins that they were lucky to have their

jobs and no one else would hire them; these statements could be abusive remarks based upon sex. Plaintiff's showing is not as strong on the issue as to whether Farmer's conduct unreasonably interfered with Plaintiff's work performance.  Plaintiff testified that Farmer's conduct caused her to feel sick and get diarrhea at work two or three times per week especially after the investigation. Higgins observed Plaintiff numerous times become distressed at work and get upset as a result of Farmer's conduct.  Although considering each episode and event in isolation may not be too severe, considering all the circumstances and Farmer's conduct together, Plaintiff's showing on the Ocheltree factors is sufficient to defeat the motion for summary judgment.

### 3. Hostile Work Environment – Ellerth-Faragher Defense

Defendant argues that as a matter of law no "tangible employment action" occurred and B&C can establish the two elements of the Ellerth-Faragher affirmative defense, and thus, the court should find that Farmer's conduct cannot be imputed to B&C.  Plaintiff argues that the Ellerth-Faragher affirmative defense is not available to B&C because Plaintiff's supervisor was the harasser and Farmer's conduct culminated in a "tangible employment action."  The United States Supreme Court held that if the offending party is the plaintiff's supervisor the employer will be strictly liable where the harassment culminated in a tangible employment action.  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  If the offending supervisor did not commit a tangible employment action, the employer can avoid liability if it can show (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided.  Id.  See also Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001) (noting that examples of tangible employment action include discharge, demotion or undesirable reassignment).

-31-

Defendants argue how nothing that happened to Plaintiff culminated in a "tangible employment action." Defendants discount a litany of possible actions that Plaintiff may claim satisfy this legal standard; however, in Plaintiff's Opposition Brief she argues that her constructive discharge was the tangible employment action. Accordingly, the court will address only that issue.

The United States Supreme Court explained how the Ellerth-Faragher affirmative defense should play out where constructive discharge is alleged, and the Court declared that the said defense can be available in constructive discharge cases in certain circumstances. In Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004), the Supreme Court held that where a plaintiff can show "that the abusive working environment became so intolerable that her resignation qualified as a fitting response," the employer may defend against such a claim by proving "both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." Id. The Court further held that this affirmative defense is not available to the employer "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." Id. The Court explained that for a plaintiff to prove a hostile work environment constructive discharge claim the plaintiff must prove something more than an actionable sexual harassment claim. Id. at 146-48. A plaintiff must show that working conditions were so intolerable that a reasonable person would have felt compelled to resign. Id. See Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151, 1159 (8th Cir. 1999) (noting that the supervisor's continuous fondling of his genitals in front of plaintiff and using lewd and sexually inappropriate language

survived summary judgment on a sexual hostile work environment claim but that as a matter of law the sexual harassment was not so intolerable that a reasonable person would be forced to quit); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) (noting that unless conditions are beyond "ordinary" discrimination, the complaining employee is expected to remain on the job while seeking redress).

Courts have held that the following factors do not render a working environment intolerable: dissatisfaction with work assignments, feeling of being unfairly criticized, difficult or unpleasant working conditions, and a stressful environment. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180 (4th Cir. 2004); Williams v. Giant Food, Inc., 370 F.3d 423 (4th Cir. 2004). However, if management is indifferent to the employee's reported complaints and there is no chance of fair treatment or if there is a lack of recourse within the organization, those considerations can factor into whether the working environment was intolerable such that the employee felt compelled to resign.

Plaintiff testified that on her first day back from maternity leave she thought about leaving B&C. She thought of leaving because: in March of 2006 Millwood had rudely suggested that she not come back from maternity leave, on the day she returned to work Millwood told her he could be her best friend or worst enemy, and Millwood told Plaintiff that he and Farmer had told Little what they thought of her. Plaintiff further resigned because of Farmer's treatment of her and B&C's refusal to remedy the situation. Plaintiff was on maternity the eight weeks prior to her resignation, so immediately prior to her resignation she was not enduring any offensive conduct at the hands of Farmer. The first several months of 2006 before she left for maternity leave, there is no evidence that Farmer touched Plaintiff or told offensive sexual stories to her. Farmer was telling B&C people that Plaintiff was not a team player and that she had a bad attitude, which in the light most favorable

-33-

to Plaintiff, were retaliatory acts and part of Farmer's harassment.  Although Farmer's conduct caused Plaintiff stress and unhappiness and made her working conditions more difficult, he was not physically threatening Plaintiff or stalking her or putting her in any danger.[6]  Because the prior hotline call resulted in a formal prompt investigation by B&C and discipline to Farmer, it would have been reasonable for Plaintiff to have called the hotline and/or followed the company policy[7] to report her concerns to the President and CEO if she was uncomfortable meeting with Basden.  Plaintiff could have formally requested a transfer to another department and continued working while attempting to redress her grievances.  Under the circumstances, although the evidence shows that the Plaintiff's hostile work environment was sufficiently severe and pervasive, Plaintiff's working conditions were not so intolerable that a reasonable person would have felt compelled to resign.  Thus, no reasonable juror could conclude that the Plaintiff was constructively discharged, and therefore, that was not a tangible employment action.

Because there was no "tangible employment action," B&C may attempt to establish the Ellerth-Faragher affirmative defense.  See Baldwin v. Blue Cross / Blue Shield, 480 F.3d 1287, 1303 (11th Cir. 2007) (employer bears the burden of establishing both elements of the defense).   B&C argues that it exercised reasonable care to prevent and promptly correct Farmer's sexually harassing behavior (first prong).  B&C had instituted a hotline for employee concerns.  B&C had a policy against sexual harassment that explained who to contact within the company in case of sexual harassment.  After the hotline call in February 2005 about Farmer, B&C promptly investigated the

---

[6] It should be noted that throughout Plaintiff's employment she continued to receive raises, receive year-end bonuses which increased in amount, and by her own testimony receive fair reviews, except for the May 2006 review.

[7] See (Def's Exh. Y).

matter.  B&C did discipline Farmer by giving him a memo of "consensus corrective action counseling" on February 24, 2005 and required him to apologize to the purchasing department. Farmer received verbal discipline, and coaching and counseling.  Farmer was required to attend sexual harassment training, and Plaintiff was told to report to Berg.  On the other hand, Berg seemed to be the supervisor in name only because Farmer had final control of raises and reviews.  Farmer's sexually harassing conduct soon resumed and he began several retaliatory actions against Plaintiff and Higgins.  Plaintiff and Higgins met with Basden in person in August 2005 to discuss who their supervisor would be, and Basden stated, "Y'all haven't gotten past this, yet, you can't move on?... maybe if y'all can't get past this, y'all should transfer, maybe look for another job."  After that meeting, Plaintiff and Higgins sent a letter to Basden to further express their concern about Farmer's conduct.  Also, Berg gave a detailed exit interview statement to B&C in August of 2005 where she detailed Farmer's conduct and stated her opinion that Farmer was not properly disciplined.  The court finds that there is a material issue of fact as to whether B&C acted reasonably under the circumstances to correct Farmer's harassing behavior.

B&C argues that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that the employer provided or to avoid harm otherwise (second prong). B&C argues that when Farmer's conduct resumed after the February 2005 investigation plaintiff failed to report his conduct to the proper people in management.  The evidence shows that Plaintiff did report to Basden in August 2005 that Farmer's conduct was continuing.  However, Plaintiff did not go to human resources to request a transfer.  She also did not report the situation directly to the President & CEO or call the hotline.  The court finds that Plaintiff unreasonably failed to take

advantage of B&C's reporting procedures and failed to seek out a firm offer of a transfer (avoid harm otherwise).

**B. Claims against B&C based upon Title VII Retaliation**

Plaintiff brings a claim for retaliation in violation of Title VII. Title 42, Section 2000e-3(a) of the United States Code provides, in relevant part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her (including actions that a reasonable employee would have found to be materially adverse in that it might have dissuaded a reasonable worker from making or supporting a charge), and (3) a causal connection existed between the protected activity and the adverse action. Matvia v. Bald Head Island Management, Inc., 259 F.3d 261, 271 (4th Cir. 2001); Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). In order to establish the requisite causal connection, plaintiff must proffer evidence which establishes that she would not have been terminated but for her protected activity. Hopkins v. Baltimore Gas & Electric Co., 77 F.3d 745, 755 (4th Cir. 1996). If a plaintiff can show a prima facie case, the burden shifts to the employer to rebut the presumption by proffering a non-retaliatory reason for its action. Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006). If the employer does so, then a plaintiff must show that the employer's proffered reason is pretextual. Id.

**1. 300-Day Statute of Limitations**

Defendants argue that because Plaintiff did not file her EEOC charge until May 18, 2006, all discrete retaliatory acts which occurred before July 22, 2005, are time barred. Plaintiff does not appear to dispute that. Therefore, the court finds that it is undisputed that all discrete retaliatory acts which occurred before July 22, 2005, are not actionable.

### 2. Materially Adverse Actions Against Plaintiff

Both parties appear to agree that when the Plaintiff participated in the February 2005 investigation against Farmer she engaged in protected activity. Defendants argue that the Plaintiff has not presented evidence that after the investigation the Defendants took any materially adverse action against the Plaintiff.[8] Plaintiff asserts the following materially adverse actions that were taken against the Plaintiff after the investigation: the wrath Plaintiff incurred at work at the hands of Farmer and Millwood; lower raises, lowered evaluations,[9] reduced bonuses; constructive discharge of Plaintiff; and sending Plaintiff home and disparaging her on May 15, 2006. In the light most favorable to Plaintiff, the court does not accept her assertion that Defendants constructively discharged her for the reasons previously discussed. Also, the evidence in the record relating to bonuses and Plaintiff's salary does not support any materially adverse action that might have dissuaded her from reporting sexual harassment. Plaintiff's bonus at year-end 2005 was larger than the 2004 year-end bonus, and Plaintiff did receive a year-end 2005 raise.

_____

[8] Defendants do not argue that Farmer acted outside the scope of his employment when he perpetrated the "materially adverse actions" discussed herein.

[9] Defendants argue that even after Burlington Northern, a negative performance evaluation would not dissuade a reasonable worker from making or supporting a charge of discrimination. Defendants rely on Parsons v. Wynne, 221 Fed. Appx. 197 (4th Cir. 2007), an unpublished decision, but the facts of that case do not reveal if the performance evaluation was negative, what it said, and any surrounding comments by the supervisor.

There is evidence that Plaintiff's May 2005, December 2005, and May 11, 2006, evaluations reflected lower overall scores than Plaintiff has received prior to the investigation in November 2004 (3.85), June 2004 (3.7), and December 2003 (4.0). However, the Plaintiff did not object to management about her May 2005 and December 2005 scores; she agreed that they were accurate. In Plaintiff's May 2005 evaluation, her overall score was 3.1. Farmer wrote Plaintiff's year end 2005 evaluation and gave her an overall score of 3.2. In May 2006, Millwood's review contained a behavioral section which contained some negative comments.[10] The review stated that Plaintiff needed to better understand teamwork and she needed to develop a good working relationship with her supervisors. Plaintiff objected to Millwood about the behavioral section of the review, and she refused to sign it. Although Millwood apparently changed the May 2006 review in Plaintiff's favor, the revised review is not in the record.

There is evidence that after the investigation Farmer undertook a campaign to discredit Plaintiff's reputation at B&C and to lower her evaluation scores. During the meeting where Spivey asked Berg to be Plaintiff's supervisor, Berg heard Farmer saying to Spivey that Plaintiff was not a team player and had a bad attitude. Prior to the May 2006 evaluation, Millwood and Farmer went two or three times to Little in human resources to discuss Plaintiff's behavior of joining together with Higgins to complain. In other words, Farmer began telling human resources that Plaintiff was a complainer. After the investigation, Farmer labeled the Plaintiff as a complainer to Millwood, who reported to Farmer. Millwood, however, testified that Plaintiff nor Higgins ever complained to him.

---

[10] In the July 2005 review, Berg wrote a behavioral review of the Plaintiff, but this is not evidence of retaliation. After the investigation, Berg had heard Farmer saying that Plaintiff was not a team player and had a bad attitude. Therefore, Berg decided to write a behavioral review in order to protect Plaintiff.

The only evidence of Plaintiff's complaining is about Farmer's unwelcome conduct and which supervisor she wanted to report to. Therefore, Farmer and Millwood's actions of unjustifiably labeling Plaintiff as a complainer and Millwood's reflecting that opinion on her behavioral review was a materially adverse action taken against her.[11]

On Monday, May 15, 2006, the first business day after her resignation, Defendants gave Plaintiff a box and asked her to leave immediately even though no one saw her doing anything disruptive.[12] Plaintiff testified that she passed out a copy of her resignation letter to her co-workers. Millwood believed that it was in B&C's best interest for Plaintiff and Higgins to leave immediately because people were speculating about the reasons they resigned and Millwood felt that people could not focus on work. The evidence shows that at B&C after an employee resigns some employees are permitted to work two weeks, some are given luncheons, and some are asked to leave immediately. B&C's asking Plaintiff and Higgins to leave immediately is not evidence of a materially adverse action.

Plaintiff argues that Millwood's treatment of her from January 2006 until her last day was a materially adverse action. The evidence shows that he was belligerent and rude to Plaintiff, but also that he acted that way to Scales. The court finds that Millwood's general behavior toward the

---

[11] It should be noted, as set forth above, a plaintiff's standard for showing an employer's action was materially adverse is a lesser burden than proving that the action was related to the terms or conditions of employment which is the standard for certain Title VII claims. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

[12] Plaintiff may be claiming another "materially adverse action" – that B&C disparaged her reputation as a "disgruntled" employee who did not handle her business affairs appropriately. To the extent Plaintiff makes this claim, the court finds that B&C's conduct does not qualify as a materially adverse action taken against the Plaintiff during her employment. When this conduct occurred, Plaintiff was no longer employed.

Plaintiff was not a materially adverse action, except to the extent that he joined together with Farmer to label Plaintiff a complainer and reflect that in her evaluation.

### 3. Causal Connection

Defendants argue that Plaintiff has not presented any evidence that their conduct, even if it was a materially adverse action, was causally connected to Plaintiff's protected activity. Defendants argue that a substantial amount of time lapsed between the February 2005 protected activity and any of the alleged retaliatory conduct. They point to several cases which find that a lapse of three and four months was insufficient to establish a causal connection based on temporal proximity. Plaintiff argues that the time frame could hardly be closer. The court finds that the conduct which qualifies as materially adverse actions began very soon after the conclusion of the February 2005 investigation – during the meeting where Farmer told Spivey that Plaintiff had a bad attitude and was not a team player. The materially adverse conduct continued until May of 2006 (Millwood's negative evaluation). Even if there was a gap in time between the protected activity and the materially adverse actions, Farmer's stating to Higgins "I can't fire you now because of this sexual harassment thing," shows that Farmer knew to be careful about retaliating so he may have waited for an opportunity to arise. The Plaintiff has presented evidence of a causal connection between the protected activity and the materially adverse action.

### 4. Employer's Proffered Non-Retaliatory Reason

If a plaintiff can show a prima facie case, the burden shifts to the employer to rebut the presumption by proffering a non-retaliatory reason for its action. Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006). Defendants argue that their actions were justified by legitimate, non-retaliatory reasons. Because the court finds that only certain actions can establish Plaintiff's prima facie case,

it will only discuss the Defendants' proffered reasons for those particular actions.  First, there is no specific non-retaliatory reason given as to why Farmer began telling human resources, Spivey, Berg, and Millwood that Plaintiff was a complainer, had a bad attitude, and was not a team player. Defendant does assert that the reason that Millwood conducted the additional behavioral review of Plaintiff in May 2006 was that Millwood did a behavioral review on all of his employees in May of 2006.  Defendants further assert that the overall score given to Plaintiff and Higgins by Millwood was in the top 5% of scores he had given during his twelve years with B&C during reviews of 700 or 800 people.  Millwood's testimony establishes a non-retaliatory reason for his action but not for Farmer's actions.

After a defendant satisfies its burden of production of a non-retaliatory reason, the burden shifts back to a plaintiff to produce evidence that the defendant's reason is not its true reason, but is pretext for a retaliatory reason.  It is a plaintiff's burden ultimately to show that retaliation for protected activity was the motivating factor in the adverse employment actions.  It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination (or adverse employment action)."[13]  Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir. 2000) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)); DeJarnette, 133 F.3d at 299 ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment

_____

[13]  "Proof that the employer's proffered reasons are unpersuasive, or even obviously contrived, . . . does not necessarily establish that [plaintiff's] proffered reason (race discrimination) . . . is correct." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000).  "It is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004). Plaintiff must show a reasonable jury could "believe [her] explanation of intentional race discrimination." Id.

discrimination ...." (internal quotation marks omitted)); <u>Henson v. Liggett Group, Inc.</u>, 61 F.3d 270, 277 (4th Cir.1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); <u>Jiminez v. Mary Washington College</u>, 57 F.3d 369, 377 (4th Cir.1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer").

      Plaintiff argues that the following shows pretext, and the court finds that there is evidence in the record to establish: Plaintiff reliably did her job and did it well; there is no evidence that she was a whiner or complainer except with regard to objecting to Farmer's unwelcome conduct; and it can be reasonably inferred from the facts that Millwood wrote the negative behavioral analysis about Plaintiff because Farmer was Millwood's supervisor and Farmer wanted him to write that section and had gone to HR with Millwood to discuss how to write the behavioral. The court finds that a reasonable juror could conclude <u>the</u> motivating factor for Plaintiff's negative behavioral review and Farmer's campaign to label Plaintiff as a complainer or not a team player was because she had willingly participated in the investigation of Farmer's sexual harassment. Accordingly, the court recommends that the motion for summary judgment be denied on the retaliation claim.

### C. Title VII Damages and Plaintiff's Duty to Mitigate

      Defendants move for summary judgment on certain damages that could stem from a Title VII case -- back-pay, front-pay and employment benefits – because Plaintiff did not fulfill her statutory duty to seek "substantially similar" employment. "In the case of a Title VII claimant who has been unlawfully discharged, the duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was

-42-

discharged." <u>Brady v. Thurston Motor Lines, Inc.</u>, 753 F.2d 1269, 1273 (4th Cir. 1985). If a claimant undertakes similar employment and then voluntarily quits back pay should be decreased by the amount he would have earned had he not quit. <u>Id.</u> Defendants argue that as a matter of law Plaintiff and Higgins failed to mitigate damages because their cleaning business only keeps them busy part-time. Plaintiffs respond that they have put much effort into their business and desire to grow it into a full-time business and if the business does not grow they will seek full-time employment elsewhere. Plaintiff relies on the proposition that the "decision to become self-employed, alone, does not indicate a lack of reasonable diligence." <u>Id.</u> at 1468. The court believes that because of its recommendation above that as a matter of law the Plaintiff was not constructively discharged by B&C and rather she voluntarily quit, she cannot as a matter of law recover back-pay, front-pay, and employment benefits. In other words, Plaintiff was paid in full for her work, and B&C does not owe her any monetary damages related to wages or benefits that she could have earned. <u>Cf.</u> <u>Martin v. Cavalier Hotel Corp.</u>, 48 F.3d 1343, 1358 (4th Cir. 1995) (noting that if a constructive discharge is proved, back pay is usually awarded by the judge as a matter of course). The Plaintiff, of course, may seek to recover other damages available pursuant to Title VII.

### D. State Law Claims

Defendants move for summary judgment on each of the Defendants' state law claims.

#### 1. Negligence against B&C

Defendant B&C argues that the claims against it for negligence and negligent retention or supervision should be dismissed because they are barred by the South Carolina Worker's Compensation Act. The statute provides:

-43-

> The rights and remedies granted by this Title to an employee when he and his employer have accepted the provisions of this Title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee ... against his employer, at common law or otherwise, on account of such injury, loss of service or death.

S.C. Code Ann. § 42-1-540.  The exclusivity provision of the Act precludes an employee from bringing a tort action against his employer for a work-related injury.  Edens v. Bellini, 597 S.E.2d 863 (S.C. Ct. App. 2004).  The exceptions to the exclusivity provisions are: ... "(2) where the injury is not accidental but rather results from the intentional act of the employer or its alter ego; (3) where the tort is slander and the injury is to reputation...."  Id.

Plaintiff asserts that she only seeks damages of a non-personal injury nature for her loss of employment and injury to dignity.  Because the South Carolina courts have broadly interpreted the exclusivity provision, the court finds that Plaintiff's claims for negligence and negligent retention or supervision should be barred by the exclusivity provision of the Act.

### 2. Outrage against Farmer

Defendant Farmer moves for summary judgment on the Plaintiff's claim for intentional infliction of emotional distress or outrage.  To survive a motion for summary judgment a plaintiff must present evidence of these factors:

> 1) the defendant intentionally or recklessly inflicted severe emotional distress, or was certain, or substantially certain, that such distress would result from his conduct; (2) the conduct was so "extreme and outrageous" so as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community;" (3) the actions of the defendant caused plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "severe" such that "no reasonable man could be expected to endure it."

Hansson v. Scalise Builders, 650 S.E.2d 68, 70 (S.C. 2007).  Defendant argues that there is no evidence that Plaintiff's mental anguish was severe.  The court should play a gate-keeping role to

ensure that this tort does not become a "panacea for wounded feelings" and a plaintiff must present third-party witness testimony and other corroborating evidence that the plaintiff had "severe" emotional distress. Id. Plaintiff testified that she often got diarrhea and felt sick due to Farmer's conduct. The corroborating evidence is that Higgins saw Plaintiff become upset and seemingly ill after numerous incidents with Farmer and that Plaintiff complained to her about sleeping problems, stomach problems, and headaches. However, the Plaintiff did not go to counseling or a medical doctor and did not miss work because of Farmer's conduct. The court believes that as a matter of law there is insufficient evidence to establish that Plaintiff's emotional distress was severe. Accordingly, Defendant Farmer should be granted summary judgment on this claim.

### 3. Intentional Interference With Contract against Farmer

Defendant Farmer also moves for summary judgment on the claim for intentional interference with contract. Farmer argues that because Plaintiff voluntarily resigned (and was not constructively discharged) there was no breach of the employment at-will contract. Farmer also argues that he cannot be a third party who interfered with Plaintiff's at-will contract with B&C because he was an agent of B&C. Plaintiff agrees that agents of employers are not third parties to the employer's contracts. Plaintiff urges the court to resolve this claim at trial depending on whether Farmer acted within or outside the scope of his employment.

In South Carolina, the elements of a cause of action for tortious interference with a contract are: "(1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." Camp v. Springs Mortg. Corp., 426 S.E.2d 304, 305 (S.C. 1993). The court finds that because as a matter of law the Plaintiff was not constructively discharged and that she voluntarily quit, as discussed above,

then this claim should fail.  As a matter of law, no contract was breached; the Plaintiff resigned. Therefore, summary judgment should be granted on this claim.

### 4. Assault and Battery against Farmer

Defendant Farmer moves for summary judgment on the assault and battery claims because they are barred by the exclusivity of the Worker's Compensation Act and because Plaintiff gave implied consent or was comparatively negligent.  The court finds that Plaintiff can bring a tort action against Farmer individually for assault and battery; the Act does not preclude that.  Also, comparative negligence is not a defense to an intentional tort and there is no evidence of implied consent.  Accordingly, Farmer's motion for summary judgment should be denied as to the assault and battery claims.

### 5. Defamation against both Defendants

Both Defendants move for summary judgment on Plaintiff's claims of defamation.  A plaintiff can recover for defamation for injury to her reputation as the result of the defendant's communication to others of a false message about the plaintiff.  Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 508 (S.C. 1998).  In South Carolina, slander is actionable per se if it charges Plaintiff with one of five acts or characteristics: "(1) commission of a crime of moral turpitude; (2) contraction of a loathsome disease; (3) adultery; (4) unchastity; or (5) unfitness in one's business or profession."  Id. at 511.  The elements a plaintiff must prove are: a false and defamatory statement was made; the unprivileged statement was published to a third party; the publisher was at fault; and either the statement was actionable irrespective of harm or the publication of the statement caused special harm.  Fleming v. Rose, 567 S.E.2d 857, 494 (S.C. 2002).

-46-

The Plaintiff appears to allege that two separate incidents constituted defamation. First, Farmer (and possibly senior management) called Plaintiff and Higgins "dumb blonde bimbos" and said that Plaintiff and Higgins "looked stupid together." There is evidence that Farmer told Plaintiff and Higgins that people at B&C were making these comments. Scales and Berg testified that they heard Farmer make the "dumb blonde bimbo" comment about Plaintiff and Higgins. Plaintiff testified that after she and Higgins complained to Spivey about the comments in June 2003 Farmer never used that term again. The statute of limitations for defamation is two years,[14] and there is no evidence that the comment was made after June 2003. Thus, the Plaintiff's complaint filed on May 31, 2006, was untimely to raise defamation based upon the "dumb blonde bimbo" comment, and the defendants should be granted summary judgment on that claim for defamation.

Second, Plaintiff argues that Doug Wendel's speech to the fourth floor employees at B&C on May 15, 2006, was defamation because Wendel stated that Plaintiff and Higgins were "disgruntled," "were not conducting their business affairs in an appropriate manner," and that B&C supported Farmer 100 percent. Wendel was the CEO of B&C, and Wendel obtained his information from Spivey. Spivey obtained his information from Basden who obtained her information from Millwood and Little. No one testified that Plaintiff and Higgins were acting "disgruntled" or that they had not conducted their business affairs in an appropriate manner. Thus, Plaintiff argues that the statements were not true. B&C argues that as a matter of law a qualified privilege existed to make those statements because Wendel acted within the scope of his CEO duties by calling a meeting of employees who worked on the same floor with Plaintiff in order to put rumors to rest and get everyone back to work. "A communication made in good faith on any subject matter in which

---

[14] See S.C. Code Ann. § 15-3-550 (1976).

the person communicating has an interest or duty is qualifiedly privileged if made to a person with a corresponding interest or duty even though it contains matter which, without this privilege, would be actionable." Constant v. Spartanburg Steel Products, Inc., 447 S.E.2d 194, 196 (S.C. 1994). "The publisher must not wander beyond the scope of the occasion." Id. "One publishing under a qualified privilege is liable upon the proof of actual malice. Actual malice can mean the defendant acted recklessly or wantonly, or with conscious disregard of the plaintiff's rights. It is ordinarily for the jury to determine whether the privilege has been abused or exceeded." Id.

The court finds that Wendel's statements made to fourth floor employees are entitled to a qualified privilege as a matter of law. Even if they were not accurate or true statements, Wendel made them in good faith based upon information he received from his subordinate. There is no evidence in the record to support that Wendel acted with actual malice. Accordingly, summary judgment should be granted to B&C on the second alleged defamation claim.

## V.    CONCLUSION

In light of the above analysis, it is recommended that Defendant B&C and Farmer's Motions for Summary Judgment (Document # 58) be granted in part and denied in part as set forth above.


                                            s/Thomas E. Rogers, III
August 11, 2008                             Thomas E. Rogers, III
Florence, South Carolina                    United States Magistrate Judge

**The parties' attention is directed to the important notice contained on the following page.**

-48-

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail.  Fed. R. Civ. P. 6(a) & (e).  Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk

United States District Court

P. O. Box 2317

Florence, South Carolina 29503

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).